INLAND EMPIRE PUBLIC LANDS COUNCIL, The Ecology Center, and Alliance for the Wild Rockies, Plaintiffs,

v.

Dan GLICKMAN, Secretary, United States Department of Agriculture, and U.S. Fish and Wildlife Service, Defendants,

and

Intermountain Forest Industry Association, Defendant–Intervenor.

No. CV 95–133–M–CCL.

United States District Court,
D. Montana,
Missoula Division.

Dec. 18, 1995.

432

Patti Goldman, Sierra Club, Seattle, WA, Deborah Sivas, Inland Empire Public Lands Council, Palo Alto, CA, James Angell, Sierra Club, Bozeman, MT, for plaintiffs.

Sandra Zellmer, U.S. Dept. of Justice, Washington, DC, for defendants.

Bruce Smith, Boise, ID, William Brooke, Bozeman, MT, for intervenors.

## OPINION & ORDER

LOVELL, District Judge.

Before the court are Plaintiffs' Motion for Summary Judgment, Defendants' Cross Motion for Summary Judgment and Motion to Dismiss, and Defendants' Motion to Strike Extra–Record Documents. The court heard oral argument on the motions on December 14, 1995. Having considered the administrative record, the written briefs and the oral arguments, the court is prepared to rule.

### BACKGROUND

**The Kootenai Timber Sales.**

Plaintiffs filed this action pursuant to § 2001(f) of the 1995 Emergency Supplemental Appropriations for Additional Disaster Assistance, for Anti-Terrorism Initiatives, for Assistance in the Recovery from the Tragedy that Occurred at Oklahoma City, and Rescissions Act ("Rescissions Act"), Pub.L. No. 104–19, and seek a permanent injunction prohibiting Defendants from proceeding with salvage timber sales on the Kootenai National Forest in Northwestern Montana. In August 1994, a lightning storm ignited more than 200 fires on the Kootenai National Forest and burned about 55,000 acres. Over 11,000 of those burned acres were in Bear Management Unit 17 (BMU 17), which is in the Cabinet/Yaak Grizzly Bear Recovery Zone. About 3,000 acres burned in the South Fork Yaak Area and about 8,155 acres burned in the North Fork Area. Of the burned area, the Forest Service proposes to conduct harvest activities on 1,012 acres in the South Fork Yaak area and 1,856 acres in the North Fork area.[1]

Following the fires, the Forest Service explored the possibility of allowing salvage timber logging in the burned areas. In May 1995, the Forest Service issued a Draft Environmental Impact Statement ("DEIS") for the North Fork Salvage sale, pursuant to the National Environmental Policy Act ("NEPA"). A similar DEIS was issued in August 1995 for the South Fork Yaak sale. Both documents identified and analyzed the potential environmental impacts the sales might have on water resources, vegetation, wildlife, recreation, public access, roadless areas, and air quality.

After the passage of the Rescissions Act but prior to any sale, the Forest Service determined that the Kootenai Sales fell within the definition of "salvage timber sales" under § 2001(a)(3) of the Act.[2] Pursuant to § 2001(c)(1)(A) of the Act, the Forest Service then prepared a Biological Assessment ("BA") for both salvage sales and concluded that the sales were not likely to adversely affect the Kootenai grizzly bears, which are

---

1. The Cabinet/Yaak Grizzly Bear Recovery Zone is divided into 22 Bear Management Units (BMUs) which are used for habitat evaluation and population monitoring. Each BMU is divided into several Bear Assessment Areas (BAAs), each consisting of between 500 and 15,000 acres. BMU 17, the portion of the forest affected by the Kootenai Sales, is 139 square miles and comprises 8 BAAs. This area straddles the Three Rivers Ranger District and the Rexford Ranger District.

2. This section defines "salvage timber sale" as "a timber sale for which an important reason for entry includes the removal of disease- or insect-infested trees, dead, damaged, or down trees, or trees affected by fire or imminently susceptible to fire or insect attack." Plaintiffs have not challenged the section 2001(a)(3) designation.

listed as a threatened species under the Endangered Species Act. After a round of discussions, the U.S. Fish and Wildlife Service ("FWS") concurred with the BA's conclusion that the sales were not likely to adversely affect the grizzly bear.

On October 4, 1995, the Forest Service issued a Notice of Decision to implement its plan to accomplish salvage timber harvest through four salvage sales on 1,856 acres in the North Fork Area. Harvest volume is projected at 19.4 million board feet. The Forest Service issued a Notice of Decision on October 12, 1995, for the South Fork Yaak area to implement its plan to conduct five salvage sales on 1,012 acres. Harvest of about 16.9 million board feet is expected. The Forest Service then published invitations to bid on two of the sales and has awarded contracts.

Plaintiffs met the statutory deadline and filed this action on November 3, 1995. Pursuant to § 2001(f)(2), the Forest Service has taken no action on the challenged sales. The parties, including Defendant–Intervenor Intermountain Forest Industry Association, have complied with an expedited briefing schedule, and the parties agreed that the matter should be submitted to the court on cross motions for summary judgment.

**The Rescissions Act**

On July 27, 1995, President Clinton signed the Rescissions Act, which included the Emergency Salvage Timber Sale Program in § 2001. In passing the Act, Congress intended to expedite the harvest of the backlog of dead and dying trees in the national forests before the trees lost their economic value and to reduce the possibility of future,

hotter fires in the damaged areas. *See* Conference Report to H.R. 1158, H.R. 104–124, 104th Cong., 1st Sess.[3] This is also evident from the fact that the Act provides for a streamlined sales process and an expedited[4] and limited judicial review process. To streamline the sales, the Secretary of Agriculture is directed to "prepare a document that combines an environmental assessment under section 102(2) of the National Environmental Policy Act of 1969[5] . . . and a biological evaluation under section 7(a)(2) of the Endangered Species Act of 1973." § 2001(c)(1)(A). These documents need consider the environmental impacts of the salvage sales and their effect on threatened or endangered species only to the extent which the Secretary, in his sole discretion, deems appropriate and feasible. § 2001(c)(1)(A). Similarly, the Secretary has sole discretion to determine the extent to which the decision to offer the sale is consistent with any standards or guidelines outlined in existing forest management plans or guidelines. *Id.*

The Secretary then must "design and select the specific salvage timber sales to be offered on the basis of the analysis contained in the document or documents prepared pursuant to paragraph (1) to achieve, to the maximum extent feasible, a salvage sale volume level above the program level." § 2001(c)(4). Further, the documents and procedures required by the Act are expressly deemed to satisfy NEPA, the National Forest Management Act and the Endangered Species Act—laws that are normally applicable to timber sales. § 2001(i). In short, the Act leaves the scope and content of the environmental documents and the information prepared, considered, and relied upon to

3. "The managers note that the emergency forest health situation from fire, insect infestation and disease has approached epidemic levels. As a result, the backlog of dead and dying trees in the National Forests and other public lands is substantial.

In part, the severe risk of permanent damage to forest land necessitates removal of dead, dying, and salvage trees before greater damage occurs—including second phase fires which burn hotter and destroy land and streams. Conference Report at 134.

4. The Act requires that "[t]he court shall render its final decision relative to any challenge within

45 days from the date such challenge is brought, unless the court determines that a longer period of time is required to satisfy the requirement of the United States Constitution." § 2001(f)(5). In this case, the 45–day period expires on Dec. 19, 1995.

5. Section 2001(c)(1)(B) permits agencies to use pre-existing environmental documents prepared pursuant to NEPA to support a § 2001 sale. Instead of preparing the EA for each of the Kootenai Sales, the Forest Service relied upon its previously prepared DEISs, which are more extensive and in-depth documents than the EA required under the Act.

reach a decision to proceed with a salvage timber sale to "the sole discretion" of the Secretary. § 2001(f)(4), § 2001(c)(1)(C).

### Judicial Review

Judicial review under the Rescissions Act is extremely limited. The court may permanently enjoin, modify or void a salvage timber sale if, after a "review of the record," the court finds that the decision to allow the salvage timber sale was "arbitrary and capricious or otherwise not in accordance with applicable law." § 2001(f)(4).[6]

The parties disagree as to what "arbitrary and capricious" means. Defendants argue that the Rescissions Act, with its deference to the Secretary and the exemption from otherwise applicable environmental laws, mandates a standard of review which is more deferential to the agency than is the traditional arbitrary and capricious analysis. Plaintiffs, however, argue that while the Act provides considerable deference to the agency, the Act requires the Forest Service to make a reasoned decision that is based on evidence found in the record. Under this traditional Administrative Procedure Act standard, a reviewing court may not substitute its judgment for that of the agency. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). The agency's decision is arbitrary and capricious if it has failed to articulate "a rational connection between the facts found and choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). While the court should carefully examine the record, courts should defer to agency action "where the challenged decision implicates substantial agency expertise." *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1336 (9th Cir.1992); *Mt. Graham Red Squirrel v. Espy,* 986 F.2d 1568 (9th Cir.1993).

While the Rescissions Act certainly limits the court's review of agency decisions, the court finds the Forest Service's actions in offering the Kootenai Sales were not arbitrary and capricious under either standard.

6. The Act also prohibits the district courts from staying a salvage timber sale pending appeal.

### DISCUSSION

Summary judgment is properly granted under Rule 56(c) if "the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 698, 699, 98 L.Ed.2d 650 (1988). In this action, Plaintiffs argue that the FS decision was arbitrary and capricious because: 1) the Forest Service's plan to implement the sales violates established grizzly bear management standards; and 2) Secretary of Agriculture Glickman did not personally authorize the Kootenai Sales.

#### 1. Interim Core Management Strategy

Plaintiffs argue that the Forest Service's adoption of its Interim Core Management Strategy ("Core Strategy") to implement the sales is arbitrary and capricious because it departs from existing grizzly bear management policies and guidelines. They also argue that the Forest Service has not provided a rational explanation for its decision to proceed with the Core Strategy. Specifically, Plaintiffs argue that the Core Strategy does not comply with open road density standards; it does not comply with habitat effectiveness standards; and it allows certain openings to exceed a 40–acre standard.

Defendants, however, argue that the Core Strategy is consistent with the Forest Plan goal to provide sufficient quantity and quality of habitat to facilitate grizzly bear recovery. The record indicates that after the fires swept through the forest, the Forest Service met several times with the FWS to develop a plan that would allow the harvesting of the fire-damaged timber in a manner that would also meet the goals of protecting grizzly bear habitat and population. Defendants argue that the fire dramatically changed the face of the forest and new strategies and procedures were needed to manage the forest in its post-fire conditions. Far from simply rewriting

§ 2001(f)(3).

the rules to allow the logging, Defendants argue that they consulted with the FWS before a decision was made to implement the Core Strategy, which incorporates and adopts the general concepts and some of the specific recommendations found in the Interagency Grizzly Bear Committee Taskforce Report ("IGBC")—"Grizzly Bear/Motorized Access Management." Under the strategy, motorized access through the area is strictly regulated, and certain "core" areas are set aside from the salvage activity so that the bears can retreat there to avoid humans. The core areas are to be at least 2,500 acres in size in the same BMU as the harvest activities, and must be maintained for the life of the project. Upon completion of salvage operations, additional core areas equal to or larger than the harvest-affected area must be established under the plan. The FWS and Forest Service have agreed that core areas in BMU 17 which will be maintained for at least 10 years are to be designated when the IGBC makes its final recommendations for the minimum amount of core area needed to provide for the recovery needs of the bears. The strategy also requires open road densities in the BMU to be maintained at or below .75 linear miles per square mile, and it establishes opening sizes as well as unharvested movement corridors for the bears.

■ The Secretary has determined, and the FWS has concurred, that the Core Strategy will meet the management objectives of providing adequate space to avoid potential human conflict and the consequent mortality risks. Plaintiffs argue that the administrative record does not support the Forest Service's argument that the Core Strategy will meet the Forest Plan goals. However, under the Rescissions Act, the Secretary has *sole discretion* over the information considered to reach his decision (§ 2001(i)), and he has the sole discretion to determine whether it complies with existing applicable forest management plans and guidelines. In light of the deference accorded to the Secretary under the Rescissions Act, the court has carefully reviewed the referenced record, including the two draft environmental impact statements, the two BAs, and the FWS concurrences for each sale. The court concludes that the Forest Service considered each of the substantive arguments Plaintiffs have raised in opposition to the Core Strategy and further finds that the record supports the decision.

The Core Strategy is based upon the IGBC report, which is in turn based on recent scientific research. The Forest Service found, and the FWS concurred, that habitat effectiveness—the ability of area to support a species—would remain close to the desired 70 percent level during the sales, and would actually increase to 74 percent following the sales. This is bolstered by the BA, the DEIS and other portions of the referenced administrative record. Further, the Core Strategy provides that a .3–mile buffer will be maintained around the 2,500–acre core areas. Again, the decision to establish the .3–mile buffer is supported by the record as a whole and specifically by the research cited in the IGBC report. The record also demonstrates that the Forest Service considered Plaintiffs' road density concerns. The Core Strategy implements a plan that will maintain the standard of .75 linear miles of road per square mile in the BMU as a whole. While the Plaintiffs argue that this standard should apply to the smaller BAAs, the record reflects that the Forest Service considered the road density standards in the affected areas and concluded after consultation with the FWS that this standard would meet the Forest Plan goals under the changed conditions of the fire-damaged forest.

While Plaintiffs may not agree with the Core Strategy, the decision to proceed with the Core Strategy falls squarely within the Forest Service's expertise in managing the forest and the salvage timber sales. As such, the Forest Service was entitled to rely upon its own experts and their research in implementing a salvage timber plan. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Further, the court finds substantial and rational support for the plan in the administrative record. Thus, the court finds that the Forest Service's action was not arbitrary and capricious.

This finding is consistent with Congress' stated goal in enacting the Emergency Salvage Timber Sale Program of the Rescissions

Act. Congress has adopted the expedited procedures for the salvage of dead or damaged timber so that economic value will not be lost through deterioration caused by protracted delays. Congress, which is responsible for the nation's environmental laws, determined that the backlog of salvage timber on the public lands constitutes an emergency situation and ordered the Forest Service to remedy the situation by allowing the accelerated harvesting of this timber. As a simple illustration of the immediacy involved in this type of operation, counsel for Defendant–Intervenors informed the court at oral argument that one-third of the timber in the Fowler Creek Fire area may have already decayed to a point that it may not be merchantable, and about 50 percent of the timber might be lost by summer if logging is delayed for a substantial period.

For the reasons discussed above, the court finds that the Forest Service's decisions to proceed with the Kootenai Sales are not arbitrary and capricious.

### 2. *Secretary Glickman's role in the sales*

■ Plaintiffs argue that the Forest Service's decision to proceed with the Kootenai Sales is arbitrary and capricious because Secretary of Agriculture Glickman did not personally authorize the sales. Plaintiffs argue that the "sole discretion of the Secretary" language of § 2001(c)(1)(A) makes the Secretary personally responsible for the authorization of each salvage timber sale. To support this position, Plaintiffs point to the following remarks on the Senate floor:

> The timber provision that finally passed contains a change over previous language to expand the role of the Secretary of Agriculture to require his signature in order to implement new sales. Although I do not think this is a sufficient fix to this legislation, I do think it is essential for the administration to faithfully execute this authority in order to prevent serious abuse of the legal exemptions in this provision.

141 Cong.Rec. S10465 (July 21, 1995) (remarks of Senator Lieberman) (emphasis added.)

This court concurs with the Defendants, who argue that the remarks of one Senator who opposed the timber rider do not necessarily reflect Congress' intent in passing the Rescissions Act. *See Davis v. City and County of San Francisco,* 976 F.2d 1536 (9th Cir.1992).[7] The lone senator's remarks conflict with the Conference Report discussed *supra.* Courts have recognized that a conference report is the most reliable source of Congressional intent. *Department of Health and Welfare v. Block,* 784 F.2d 895, 901 (9th Cir.1986). Requiring the Secretary to personally authorize each salvage sale would impede the obvious intent that such sales proceed in the most expeditious manner possible. Further, it is clear that the Secretary has properly delegated authority to an Assistant Secretary, who has further delegated authority to the Forest Service Chief. *See* 7 C.F.R. § 2.19(b)(2), § 2.60(a)(2).

### *Motion to Dismiss*

■ In their complaint, Plaintiffs have challenged the Fish and Wildlife Service's decision to concur in the Forest Service's determination that the Kootenai Sales are not likely to adversely affect the grizzly bear. They argue that the concurrences are arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. §§ 701–706. Defendants have moved to dismiss the claim because the Rescissions Act requires that all challenges to salvage timber sales must be resolved within the timeframes outlined in the Act. The court agrees. As discussed earlier, Congress enacted the Emergency Salvage Timber Sale Program to streamline procedures for the harvest of dead and dying timber before it deteriorates. To facilitate this, Congress exempted the salvage sales from otherwise applicable environmental and natural resource laws, including the Endangered Species Act. It is clear that Plaintiffs cannot bring an action seeking to stop the salvage sales without making a claim under the Rescissions Act, which is a claim they cannot make without asserting substantive Endangered Species Act arguments. Because the Rescissions Act exempts the sales

---

7. The court notes that the District Court of Idaho reached a similar conclusion in *Idaho Conserva-* *tion League v. Thomas,* No. CV 95–425, slip op. at 27 (D.Idaho Dec. 11, 1995).

from the ESA, Plaintiffs cannot state a claim upon which relief may be granted. *See Oregon Natural Resources Council v. Thomas*, No. 95–6272–HO, slip op. at 8 (D.Ore. December 5, 1995) (rejecting plaintiff's APA challenge to a Rescissions Act timber sale and holding that the Rescissions Act bars other environmental challenges to salvage sales). Consequently, allowing Plaintiffs to proceed independently of the Rescissions Act is impermissible and would violate the clear and obvious intent of Congress.

*Motion to strike*

■ Defendants have moved to strike all extra-record documents Plaintiffs have submitted in support of their motion for summary judgment. Defendants argue that Plaintiffs' submissions are inappropriate because review of the agency's decision is limited to the administrative record. Specifically, Defendants move to strike the declarations of Brian Horejsi and Daniel F. Doaks, and Exhibits 1–4 and 6–10. Defendants argue that the documents were not considered by the agency and should be stricken. Plaintiffs respond that the documents explain technical issues and illustrate their claim that there is no evidence to support the Forest Service's claims.

On November 30, 1995, the court issued a protective order barring extra-record discovery and limiting the review of the agency decision to the administrative record. The court has reviewed the contested documents and finds that the declarations and exhibits, except for Exhibit 6, should be stricken because they were not before the agency at the time the decision was made.[8] *See Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (holding that the "focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Stop H–3 Ass'n v. Dole*, 740 F.2d 1442, 1453 n. 18 (holding that the court must examine only records created by the agency to date, not on "post hoc rationalizations" for the action).

8. Exhibit 6 was actually part of the administrative record but was incorrectly stamped as South Fork Administrative Record Document No. 606.

Accordingly,

IT IS HEREBY ORDERED that Plaintiffs' motion for summary judgment and injunctive relief is DENIED, and all relief is denied.

IT IS FURTHER ORDERED that Defendants' cross-motion for summary judgment is GRANTED.

IT IS FURTHER ORDERED that Defendants' motion to dismiss is GRANTED.

IT IS FURTHER ORDERED that Defendants' motion to strike extra-record materials is GRANTED in part and DENIED in part, as set forth in this opinion and order.

The clerk is directed forthwith to notify the parties of entry of this order.

Plaintiffs attached the document to their moving papers simply to avoid any confusion.