792 F.2d 821
 16 Envtl. L. Rep. 20,920
 Tim JONES; Nancy & James Lethcoe; Wendy Simpson; Alaska
Wilderness Sailing Safaris; Stan Stephens Charters; the
Whale Center; Simpson's Marine Charters; the Sierra Club;
Greenpeace, U.S.A.; Greenpeace, Canada; and South East
Alaska Conservation Council, Inc., Plaintiffs-Appellees,
and
State of Alaska, Intervenor-Plaintiff-Appellee.
v.
William G. GORDON, Assistant Administrator for Fisheries,
National Marine Fisheries Service; John V. Byrne,
Administrator for the National Oceanic and Atmospheric
Administration; Malcolm Baldrige, Secretary for the United
States Department of Commerce; and the United States
Department of Commerce, Defendants-Appellants.
Tim JONES; Nancy & James Lethcoe; Wendy Simpson; Alaska
Wilderness Sailing Safaris; Stan Stephens Charters; the
Whale Center; Simpson's Marine Charters; the Sierra Club;
Greenpeace, U.S.A.; Greenpeace, Canada; and South East
Alaska Conservation Council, Inc., Plaintiffs-Appellees,
and
State of Alaska, Intervenor-Plaintiff-Appellee.
v.
William G. GORDON, Assistant Administrator for Fisheries,
National Marine Fisheries Service; John V. Byrne,
Administrator for the National Oceanic and Atmospheric
Administration; Malcolm Baldrige, Secretary for the United
States Department of Commerce; and the United States
Department of Commerce, Defendants,
and
Sea World, Inc., Intervenor-Defendant-Appellant.
 Nos. 85-3739, 85-3767.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 13, 1986.
Decided June 18, 1986.
 
 Lauri J. Adams, Juneau, Alaska, for plaintiffs-appellees.
 Eileen Sobeck, Wildlife & Marine Resources Section, Washington, D.C., for defendants-appellants.
 Laura Davis, Office of the Atty. Gen., Juneau, Alaska, for intervenor, State of Alaska.
 Michael T. Thomas, Anchorage, Alaska, for intervenor Sea World.
 Appeal from the United States District Court for the District of Alaska.
 Before WALLACE and SKOPIL, Circuit Judges, and HENDERSON,* District Judge.
 WALLACE, Circuit Judge:
 
 
 1
 The National Marine Fisheries Service (the Service)[1] and Sea World, Inc. (Sea World) appeal from a district court order granting summary judgment in favor of Jones, other tour boat operators, environmental organizations, and the State of Alaska (hereafter referred to collectively as Jones). The district court declared that a Service permit authorizing Sea World to capture killer whales was invalid and void because the Service had failed to prepare an environmental impact statement. The district court further enjoined Sea World from capturing killer whales pursuant to the permit. Jones v. Gordon, 621 F.Supp. 7 (D. Alaska 1985). We have jurisdiction under 28 U.S.C. Sec. 1291. We affirm in part and reverse in part.
 
 
 2
 * In March 1983, Sea World, an operator of aquatic zoological parks, applied to the Service for a permit to capture killer whales (Orcinus orca ) for purposes of scientific research and public display. The Marine Mammal Protection Act of 1972 (the MMPA), 16 U.S.C. Secs. 1361-1407, imposes a general moratorium on the taking of marine mammals, including killer whales. MMPA Sec. 101(a), 16 U.S.C. Sec. 1371(a). One exception to this moratorium authorizes permits "for taking ... for purposes of scientific research and for public display." MMPA Sec. 101(a)(1), 16 U.S.C. Sec. 1371(a)(1). Section 104 of the MMPA, 16 U.S.C. Sec. 1374, governs the issuance of such permits. The Secretary of Commerce has delegated responsibility for issuing permits authorizing the taking of killer whales, see MMPA Secs. 3(11)(A), 104(a), 16 U.S.C. Secs. 1362(11)(A), 1374(a), to the National Oceanic and Atmospheric Administration (the Administration) and its subagency, the Service.
 
 
 3
 In its permit application, Sea World requested permission to collect up to 100 killer whales over a five-year period from Alaska and California coastal waters. Up to ten killer whales would be maintained permanently in captivity for research and display, and up to 90 would be held temporarily (no more than three weeks) for research. The numerous scientific tests proposed included liver biopsies, gastric lavages, hearing and respiratory tests, tooth extractions, and blood tests. Sea World also proposed to tag, mark, and attach radio transmitters to killer whales held temporarily.
 
 
 4
 Pursuant to MMPA Sec. 104(d)(2), 16 U.S.C. Sec. 1374(d)(2), the Service in March 1983 published notice in the Federal Register of Sea World's application and invited public comment. The Service extended the public comment period four times until it closed in August 1983. During this time, the Service received approximately 1,200 comments supporting the application and 1,000 comments opposing part or all of it. In response to requests for a public hearing, the Service also held a two-day hearing on the permit application in August 1983.
 
 
 5
 On November 1, 1983, the Service issued a permit to Sea World authorizing the permanent removal of up to 10 killer whales and the temporary capture of up to 90. The permit imposed several conditions not present in Sea World's original application. For example, Sea World was required to conduct a study of local killer whale population in Alaska areas and to submit a report to the Service. No captures could be conducted without further authorization by the Service, and the length of temporary captures was restricted. No more than 2% of a local population could be permanently removed over a two-year period, and no more than two animals could be removed from a distinct social group (pod). Killer whales temporarily captured could be recaptured no more than twice. Many of the planned tests also required further authorization by the Service.
 
 
 6
 On May 1, 1984, Jones sought declaratory and injunctive relief against the Service in federal district court, alleging that the Service's issuance of the permit without preparation of an environmental impact statement violated the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. Sec. 4332(2)(C). Sea World intervened as a defendant, and the State of Alaska intervened as a plaintiff. On cross-motions for summary judgment, the district court granted summary judgment in favor of Jones, declared the Service permit void and invalid, and enjoined Sea World from capturing killer whales pursuant to the permit.II
 
 
 7
 The Service and Sea World first challenge the district court's exercise of jurisdiction. They base their challenge on section 104(d)(6) of the MMPA, which provides:
 
 
 8
 Any applicant for a permit, or any party opposed to such permit, may obtain judicial review of the terms and conditions of any permit issued by the Secretary under this section or of his refusal to issue such a permit. Such review, which shall be pursuant to chapter 7 of Title 5, may be initiated by filing a petition for review in the United States district court for the district wherein the applicant for a permit resides, or has his principal place of business, or in the United States District Court for the District of Columbia, within sixty days after the date on which such permit is issued or denied.
 
 
 9
 16 U.S.C. Sec. 1374(d)(6). The Service and Sea World contend that Jones's action is barred by the 60-day statute of limitations of section 104(d)(6) since Jones did not file his action until six months after the Service issued the permit to Sea World.
 
 
 10
 The district court rejected this jurisdictional challenge. The district judge ruled that section 104(d)(6) did not apply to Jones's action since Jones, rather than disputing the "terms and conditions" of the permit, alleged that the Service had failed to comply with the procedural requirements of NEPA. The district judge further ruled that NEPA itself provided an independent source of jurisdiction for Jones's action. We review de novo the district court's determination of subject matter jurisdiction. Clayton v. Republic Airlines, Inc., 716 F.2d 729, 730 (9th Cir.1983).
 
 
 11
 We agree with the district court that section 104(d)(6) does not apply to Jones's action. Section 104(d)(6) does not purport to govern all challenges to section 104 permits. Rather, as to permits issued, it governs "judicial review of the terms and conditions " of such permits. MMPA Sec. 104(d)(6), 16 U.S.C. Sec. 1374(d)(6) (emphasis added). As we read this plain language, section 104(d)(6) applies only to review of the substantive elements of a section 104 permit.
 
 
 12
 Jones's action does not seek review of the terms and conditions of the Service's permit to Sea World. Jones has instead alleged that the Service, by not preparing an environmental impact statement, has violated the procedural requirements of NEPA. We recognize, of course, that this procedural claim may indirectly implicate some of the terms and conditions of the permit. Nevertheless, we have no difficulty concluding that Jones's challenge is essentially procedural in character. Because Jones does not seek review of the terms and conditions of the permit, we hold that section 104(d)(6) and its 60-day statute of limitations do not operate to bar Jones's action.
 
 
 13
 Because section 104(d)(6) does not provide jurisdiction in this case, we now must determine whether the district court had a different source of jurisdiction to entertain Jones's action. The district judge found that NEPA itself provided an independent jurisdictional basis. We need not reach that issue because jurisdiction over Jones's action arose from the combined operation of 28 U.S.C. Sec. 1331, NEPA, and the Administrative Procedure Act (APA) Sec. 10(a), 5 U.S.C. Sec. 702. Under 28 U.S.C. Sec. 1331, the district courts have original jurisdiction of all civil actions arising under the laws of the United States. Jones's action arises under APA Sec. 10(a), which gives a right of action to a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." See, e.g., California v. Watt, 683 F.2d 1253, 1270 (9th Cir.1982), rev'd in part on other grounds sub nom. Secretary of Interior v. California, 464 U.S. 312, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984). Here, the Service and Sea World do not dispute, and we hold, that Jones has adequately alleged that he was adversely affected or aggrieved by the Service's action within the meaning of NEPA. See id. at 1270-71. In addition, no statute precludes judicial review of Jones's claim. See APA Sec. 10, 5 U.S.C. Sec. 701. Therefore, the district court had jurisdiction to address Jones's action, subject only to the doctrine of laches, which is clearly inapplicable. See Preservation Coalition, Inc. v. Pierce, 667 F.2d 851, 854 (9th Cir.1982).
 
 III
 
 14
 In an argument not joined by the Service, Sea World contends that the requirement of an environmental impact statement under NEPA conflicts irreconcilably with the mandatory time limits for agency action under section 104(d) of the MMPA. Sea World argues that under Flint Ridge Development Co. v. Scenic Rivers Association, 426 U.S. 776, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976) (Flint Ridge ), the Service enjoys a blanket exemption from the duty of preparing an environmental impact statement when it issues a section 104 permit. The district court ruled that Flint Ridge did not apply. We review this question of law de novo. United States v. McConney, 728 F.2d 1195, 1201 (9th Cir.) (en banc), cert. denied, --- U.S. ----, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).
 
 
 15
 In Flint Ridge, the Supreme Court found a "clear and fundamental conflict of statutory duty" between the Interstate Land Sales Full Disclosure Act (Disclosure Act), 15 U.S.C. Secs. 1701-1720, and NEPA. 426 U.S. at 791, 96 S.Ct. at 2440. Under the Disclosure Act, the Secretary of Housing and Urban Development had a duty to allow a statement of record filed by a real estate developer to become effective (absent inaccurate or incomplete disclosure) within 30 days after it was filed. If the Secretary were required under NEPA to prepare an environmental impact statement before allowing the filed statement to become effective, the Supreme Court recognized that it would not be possible to satisfy the 30-day period of the Disclosure Act. The Court determined that NEPA itself provides that "where a clear and unavoidable conflict in statutory authority exists, NEPA must give way." Id. at 788, 96 S.Ct. at 2438. Therefore, the Court held that even if the Secretary's action allowing the filed statement to become effective constituted major federal action significantly affecting the quality of the human environment, the Secretary was not required to prepare an environmental impact statement. Id. at 791, 96 S.Ct. at 2439.
 
 
 16
 Sea World argues that section 104(d) of the MMPA is in irreconcilable conflict with the environmental impact statement requirement of NEPA. Section 104(d) sets forth certain time limitations for processing of section 104 permit applications. Once the Service publishes notice of a permit application, interested parties have 30 days in which to submit written data or views, MMPA Sec. 104(d)(2), 16 U.S.C. Sec. 1374(d)(2), and to request a hearing, MMPA Sec. 104(d)(4), 16 U.S.C. Sec. 1374(d)(4). If a party has timely requested a hearing, the Service may, within 60 days of the publication of notice, hold a hearing. Id. The Service shall issue or deny a permit within 30 days of the close of the hearing, or, if no hearing is held, within 30 days of the close of the comment period. MMPA Sec. 104(d)(5), 16 U.S.C. Sec. 1374(d)(5).
 
 
 17
 Reading these provisions together, Sea World argues that section 104(d) requires that the Service grant or deny a permit, at the latest, within 90 days after publication of notice plus the length of any hearing. We assume, for purposes of this appeal, that this reading is correct. Sea World further asserts that the Service requires approximately 360 days to prepare an environmental impact statement. For purposes of this appeal, we also accept this assertion. Sea World concludes that under Flint Ridge the Service is exempt from NEPA when issuing a section 104 permit, since it cannot prepare an environmental impact statement within the period in which it must issue or deny the permit under section 104(d) of the MMPA.
 
 
 18
 The issue is not without doubt and Sea World's argument is plausible. Nevertheless, we agree with the district court that the apparent conflict between section 104(d) and NEPA is reconcilable.
 
 
 19
 We begin our analysis with the important congressional mandate to have NEPA apply "to the fullest extent possible." 42 U.S.C. Sec. 4332. These are strong words directing our statutory interpretation. The language was added by the Senate and House conferees who stated in explanation:
 
 
 20
 The purpose of the new language is to make it clear that each agency of the Federal Government shall comply with the directives set out in ... [Section 102(2) ] unless the existing law applicable to such agency's operations expressly prohibits or makes full compliance with one of the directives impossible .... Thus, it is the intent of the conferees that the provision "to the fullest extent possible" shall not be used by any Federal agency as a means of avoiding compliance with the directives set out in section 102.... [N]o agency shall utilize an excessively narrow construction of its existing statutory authorizations to avoid compliance.
 
 
 21
 115 Cong.Rec. 39703 (1969), quoted in Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission, 449 F.2d 1109, 1114-15 (D.C.Cir.1971). Thus, it appears to be the congressional desire that we make as liberal an interpretation as we can to accommodate the application of NEPA.
 
 
 22
 Such a possible interpretation, argued by Jones, begins with the accurate observation that section 104(d) does not require that notice be published within any particular period. Instead, the Service has the broad authority to "prescribe such procedures as are necessary to carry out this section." MMPA Sec. 104(d)(1), 16 U.S.C. Sec. 1374(d)(1). Pursuant to such authority, the Service has issued a regulation that requires it to publish notice of a permit application "as soon as practicable" after the application is deemed sufficient. See 50 C.F.R. Sec. 216.33(a) (1985). Thus, the Service could withhold publication long enough to comply with any NEPA requirement for preparation of an environmental impact statement. Flint Ridge applies only when a conflict is "clear and unavoidable" and "irreconcilable and fundamental." An interpretation of section 104(d) that permits notice to be published after any needed environmental impact statement has been prepared would obviate Sea World's purported conflict. Under this reading, the Service could comply with both MMPA and NEPA, and Flint Ridge would not apply. Cf. Forelaws on Board v. Johnson, 743 F.2d 677, 683-85 (9th Cir.1984) (finding Flint Ridge inapplicable). This interpretation recognizes that Congress has provided flexibility to the Service because the triggering act for the statutory time table, the publication of notice of a permit application, is within the control of the Service. On the other hand, in Flint Ridge the agency had no such latitude because the triggering act was the filing by the applicant, an event over which the agency had no control.
 
 
 23
 Sea World contends, however, that this reading is itself inconsistent with Flint Ridge. In Flint Ridge, the Court encountered the suggestion that the Disclosure Act and NEPA could be reconciled "if the Secretary ordered the developer not to file its statement of record until HUD completed an environmental impact statement." 426 U.S. at 791 n. 13, 96 S.Ct. at 2439 n. 13. The Court concluded that the 30-day time limit of the Disclosure Act was intended to "protect developers from costly delays as a result of the need to register with HUD." Id. at 791, 96 S.Ct. at 2439. Therefore, the Court rejected the idea that the Secretary possessed an implied power to suspend the 30-day limit pending completion of environmental analysis, labeling the idea "a circumvention of the statute's language, and ... equally violative of its purpose." Id. at 791 n. 13, 96 S.Ct. at 2439 n. 13.
 
 
 24
 We acknowledge that a fine line exists between an interpretation that enables NEPA to be applied "to the fullest extent possible" and a reading that renders the limitation provision in another statute "little more than a nullity." Id. at 791. The interpretation suggested by Jones, however, neither circumvents the language of the MMPA nor violates its purpose; rather it promotes the predominant congressional purpose in enacting the MMPA--the protection of marine mammals. See Balelo v. Baldrige, 724 F.2d 753, 756 (9th Cir.), cert. denied, 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984).
 
 IV
 
 25
 The Service and Sea World next argue that issuance of the Sea World permit by the Service did not require preparation of an environmental impact statement. The district court ruled that an environmental impact statement was required. Federal courts must uphold an agency decision not to prepare an environmental impact statement unless that decision is unreasonable. Foundation for North American Wild Sheep v. United States Department of Agriculture, 681 F.2d 1172, 1177 (9th Cir.1982).
 
 
 26
 To address the argument made by the Service and Sea World, we must first sketch the statutory and regulatory framework that governed the Service's action. NEPA requires that federal agencies prepare an environmental impact statement for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. Sec. 4332(2)(C). Regulations promulgated by the Council on Environmental Quality (CEQ), see 40 C.F.R. Secs. 1500-1517 (1985), bind federal agencies in implementing this requirement. Id. Sec. 1500.3. Under these regulations, if the proposal would not normally require an environmental impact statement, an agency generally must prepare an environmental assessment in order to decide whether an environmental impact statement must be prepared. Id. Sec. 1501.4(a), (b), (c). At the same time, an agency must identify categories of actions that do not have a significant effect on the human environment; neither an environmental assessment nor an environmental impact statement is normally required for such "categorical exclusions." Id. Secs. 1501.4(a)(2), 1507.3(b)(2)(ii), 1508.4. A categorical exclusion, however, must "provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect." Id. Sec. 1508.4. CEQ regulations further outline factors "of both context and intensity" that an agency must consider in determining whether an action "significantly" affects the environment within the meaning of NEPA. Id. Sec. 1508.27. These factors include the "degree to which the effects on the quality of the human environment are likely to be highly controversial," id. Sec. 1508.27(b)(4), and the "degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," id. Sec. 1508.27(b)(5).
 
 
 27
 Pursuant to these CEQ regulations, the Administration--the parent agency of the Service--issued Revised Administration Directive 02-10, 45 Fed.Reg. 49312 (1980).[2] This directive included among actions falling within a categorical exclusion "[p]ermits for scientific research and public display under the MMPA." Id. Sec. 6.c. (5), 45 Fed.Reg. 49316. Consistent with CEQ regulations, this directive further provided for exceptions to its categorical exclusions. An environmental assessment or an environmental impact statement must be prepared for actions falling within a categorical exclusion if the actions
 
 
 28
 (a) Are likely to result in significant environmental impacts as defined in [40 C.F.R.] Sec. 1508.27, or
 
 
 29
 (b) Involve a geographic area with unique characteristics, are the subject of public controversy based on potential environmental consequences, have uncertain environmental impacts or unique or unknown risks, establish a precedent or a decision in principle about future proposals, may result in cumulatively significant impacts, or may have any adverse effects upon endangered or threatened species or their habitats.
 
 
 30
 Id. Sec. 6.c. (7), 45 Fed.Reg. 49316.
 
 
 31
 The Service and Sea World argue that the issuance of the Sea World permit by the Service fell within the categorical exclusion of Revised Administration Directive 02-10 for permits for scientific research and public display under the MMPA. The district court ruled, however, that the Service action fell within an exception to the categorical exclusion under section 6.c. (7)(b) of the Administration directive, since it both was the subject of public controversy based on potential environmental consequences and had uncertain environmental impacts or unique or unknown risks. The court ruled that the Service was required to prepare an environmental impact statement. The Service and Sea World argue that the conditions imposed in the Sea World permit sufficiently mitigated any significant effects that might have resulted from unconditional approval of Sea World's permit application and thus precluded operation of the exceptions to the categorical exclusion. The Service further argues that even if an exception to the categorical exclusion applies, the Service would not be obligated to prepare an environmental impact statement; rather, as the Administration directive provides, the Service would have the discretion to prepare either an environmental assessment or an environmental impact statement.
 
 
 32
 While mindful that we may not substitute our judgment for an agency judgment that is fully informed and well-considered, see Friends of Endangered Species, Inc. v. Jantzen, 760 F.2d 976, 986 (9th Cir. 1985), we hold that the district court did not err in concluding that the decision of the Service not to prepare an environmental impact statement was unreasonable. The Service failed to explain adequately its decision not to prepare an environmental impact statement. In its final report on Sea World's permit application, the Service merely stated:
 
 
 33
 Issuance of the permit is not a major Federal action significantly affecting the quality of the human environment; therefore, it has been determined that an Environmental Impact Statement is not necessary in this case. The permit authorizes the removal of ten animals from the wild and the conduct of field research on up to 90 additional animals. Regulations establishing public display and scientific research permit procedures under the MMPA have been in effect since 1974, and over 400 permits involving a take of 586,000 marine mammals have been issued. None have required an EIS and none have been prepared.
 
 
 34
 The Service did not address the applicability of the Administration directive. In particular, it did not discuss whether an exception to the categorical exclusion for issuance of MMPA permits for scientific research and public display applied.
 
 
 35
 "An 'agency cannot ... avoid its statutory responsibilities under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant effect on the environment.' " Steamboaters v. FERC, 759 F.2d 1382, 1393 (9th Cir.1985) (Steamboaters), quoting Township of Lower Alloways Creek v. Public Service Electric & Gas Co., 687 F.2d 732, 741 (3d Cir.1982). Instead, an agency must provide a reasoned explanation of its decision. Steamboaters, 759 F.2d at 1393.
 
 
 36
 The Service's explanation is deficient in that it fails to explain why issuance of the permit does not fall within an exception to the categorical exclusions under section 6.c. (7) of the Administration directive. The elements of section 6.c. (7)(b) are stated in the disjunctive: if any of the elements is present, the Service must prepare an environmental assessment or an environmental impact statement.[3] The Service's final report on the Sea World permit application reveals the arguable existence of "public controversy based on potential environmental consequences." Major points presented by public comments included the following: killer whales in captivity cannot perform their ecological role; permitting Sea World to capture killer whales would severely undercut the United States position against whaling; killer whales do not survive long in captivity; issuing a permit would encourage further exploitation; any exploitation would have long-term impacts on population size and structure; removing a killer whale from a group (pod) may disrupt or destroy the group's social structure. While the Service report disputes or rebuts several of these points, it nowhere explains why these points do not suffice to create a public controversy based on potential environmental consequences.
 
 
 37
 Similarly, the Service's final report reveals the arguable existence of "uncertain environmental impacts or unique or unknown risks." The Service report acknowledged the uncertain life expectancy of captive killer whales. It further recognized that the impact of removing killer whales was uncertain since so little is known concerning the size, composition, structure, and productivity of the killer whale populations at issue. It also stated that even temporary removals might affect the reproductive potential of killer whale groups.
 
 
 38
 The Service argues that the conditions contained in the permit issued to Sea World substantially mitigated any uncertain environmental effects. We agree that conditions mitigating the environmental consequences of an action may justify an agency's decision not to prepare an environmental impact statement. See id. at 1394. The conditions contained in this permit, however, rather than mitigating environmental consequences, generally operate simply to defer important agency decisions until more information has been obtained. At most, they "provide only general guidelines. Their effectiveness depends on how they are applied and enforced." Id. Moreover, the Service, in issuing the permit, provided no reasoned explanation--indeed, no explanation at all--of how these conditions would prevent application of an exception to the categorical exclusions.
 
 
 39
 We conclude, therefore, that the district court did not err in deciding that the Service has unreasonably decided not to prepare an environmental impact statement. We emphasize, however, that we disagree with the district court's conclusion that the Service must prepare such a statement for the Sea World permit. Rather, the Service must consider the requirements of NEPA and regulations thereunder, and must provide a reasoned explanation of whatever course it elects to pursue.
 
 
 40
 AFFIRMED IN PART AND REVERSED IN PART.
 
 
 
 *
 Honorable Thelton E. Henderson, United States District Judge, Northern District of California, sitting by designation
 
 
 [1]
 The Service itself is not technically a party to this action. For sake of simplicity, we refer to the Service rather than to its assistant administrator of fisheries, Gordon, who has been sued in his official capacity. The administrator of the National Oceanic and Atmospheric Administration, the Secretary of Commerce, and the Department of Commerce are also defendant-appellants
 
 
 [2]
 This directive was in effect during the entire period that the Service acted on Sea World's permit application, but has since been revised. See Revised Administration Directive Implementing the National Environmental Policy Act, 49 Fed.Reg. 29644 (1984)
 
 
 [3]
 Because the elements of section 6.c. (7)(b) are stated in the disjunctive, we cannot agree with the district court that this action merely restates the CEQ regulation in 40 C.F.R. Sec. 1508.27 (1985). The district court's reading also makes this section redundant, since section 6.c. (7)(a) of the Administration directive already explicitly incorporates by reference the CEQ regulation