Douglas L. BAKER, Plaintiff,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, an agency of the United States, et al., Defendants.

Civ. No. 94–0160–E.

United States District Court, D. Idaho.

Jan. 26, 1996.

Barry L. Marcus, Marcus Merrick & Montgomery, Boise, ID, for Douglas L. Baker, plaintiff.

Warren S. Derbidge, Asst. U.S. Atty., U.S. Attorney's Office, Boise, ID, for Department of Agriculture, Jim Lyons, Jack Ward Thomas, Robert C. Joslin, Charles Wildes, C. Gregory Johnson.

## MEMORANDUM DECISION AND ORDER

WINMILL, District Judge.

### I.

### INTRODUCTION

The Court has before it Motions for Summary Judgment filed by both parties. The Court heard oral argument on January 2, 1996, and the Motions are now at issue. The Court will resolve the Motions after reviewing the background of this litigation.

### II.

### BACKGROUND

In November and December of 1992, the Plaintiff Douglas L. Baker acquired mining claims known as the Crazy Lumberjack

Claims. These Claims are located on Adair Creek in the Challis National Forest. *See,* Affidavit of Baker at ¶ 3, pp. 2–3 (Docket No. 8). Adair Creek is a tributary of the Yankee Fork of the Salmon River.

On January 9, 1993, Baker submitted to the Forest Service a proposed Plan of Operations that contemplated removing placer deposits from the Crazy Lumberjack Claims, and hauling the material to an adjacent claim, known as the Honey Girl Claim, for processing. *See,* AR at 128.[1] To accommodate this hauling of placer material, the Plan also proposed the building of 600 feet of access road between the Crazy Lumberjack Claims and the Honey Girl Claim. *Id.*

In February, 1993, the Forest Service published a Legal Notice in the Challis Messenger newspaper requesting comments on the Plan. *See,* AR at 121. The Idaho Fish and Game Department filed a comment by letter dated February 11, 1993. *See,* AR at 120. That letter, directed to the Forest Service, stated that the project was not "in the best public interest considering the potential to seriously impact valuable fishery resources." *Id.* The letter pointed out that the Yankee Fork supports runs of summer steelhead and chinook salmon—at that time listed as "threatened species"—that could be harmed if the mining project caused sedimentation of the river. *Id.*

On March 2, 1993, the Fish and Wildlife Service of the Department of the Interior filed a comment by way of letter, suggesting that the Forest Service contact the "National Marine Fisheries Service ... to initiate consultation for chinook salmon." *See,* AR at 117. Because of this potential for harm to a "threatened species" under the Endangered Species Act, the Forest Service prepared a Biological Assessment (BA) that was completed on August 29, 1993. *See,* AR at 92. In that BA, the Forest Service concluded that Baker's Plan may affect, but is not likely to adversely affect Snake River spring/summer chinook salmon and proposed critical habitat. In order to be in compliance with the ESA [Endangered Species Act] and meet the Forest Service's responsibilities as outlined in the June 22, 1992 Guide for Section 7 Consultation with the National Marine Fisheries Service, *all* of the following criteria must be met in order to receive this "Not Likely to Adversely Affect" opinion:

a.) Mr. Baker must have ALL fisheries resource protection mitigation measures correctly in place prior to implementation of the project.

b.) Mr. Baker must implement and continue to use Best Management Practices (BMP's) as designed for the protection of water quality and fisheries resource.

c.) Continue with compliance and implementation of all site specific mitigation measures on the Honey Girl Claim. Continue to reseed and revegetate with willows on the reclaimed areas of the Honey Girl Claim and the Deep Yellow Claim until advised by the Forest Service staff that revegetation/reclamation efforts are successful and satisfactory.

*See,* AR at 92, p. 199. (emphasis in original).

The BA goes on to state that once all the mitigation measures are in place, "no further degradation of critical fish habitat is expected to occur." *Id.* But if the mitigation measures are not implemented, the BA concludes that the opinion of " 'Not Likely to Adversely Affect' the listed species of fish will need to be re-evaluated and consultation with NMFS [National Marine Fisheries Service] may be required." *Id* at p. 200.[2]

The Forest Service then prepared an Environmental Assessment (EA), which was issued on October 21, 1993. The EA concluded that "[t]here will be no affect on viability of any threatened, endangered, or Forest Service sensitive species," and that "[f]ish

1. References to the Administrative Record will be shown by the designation "AR" followed by the numbered tab where the document appears.

2. On September 2, 1993, a few days after the BA was issued, the Forest Service published a Legal Notice in the Challis Messenger newspaper indicating that the Plan had been approved. *See,* AR at 89. Six days after that Legal Notice was published, the Forest Service published a second Legal Notice indicated that the approval had been "withdrawn." *Id.* There is no challenge to this withdrawal of approval, although Baker is challenging a subsequent withdrawal of approval that occurred on December 8, 1993.

habitat and water quality within the Yankee Fork River and Adair Creek will be maintained to Forest Plan Standards by adopting mitigation measures...." *See,* AR at 41, p. 88.

On the same day that the EA was issued, October 21, 1993, the Forest Service published a Legal Notice in the Challis Messenger newspaper stating that Baker's Plan had been approved. *See,* Exhibit B to Complaint (Docket No. 1). Two days later, on October 23, 1993, Baker started construction of the road between the Crazy Lumberjack Claims and the Honey Girl Claim.

On October 29, 1993, Forest Service District Ranger Gregory Johnson filed a Notice of Non–Compliance against Baker, claiming that the road was not constructed according to the Plan, and complaining that the construction occurred "without my official notification to you that your [Plan] had been approved." *See,* AR at 83. Johnson requested that Forest Service Special Agent Pat Green investigate whether criminal charges should be filed against Baker for his construction of the road. Green did investigate and concluded that no charges should be filed. *See,* AR at 69. Green found that although Johnson had not "officially told" Baker that the Plan was approved, the Forest Service did publish a Legal Notice in the Challis Messenger newspaper on October 21, 1993 stating that the Plan had been approved, and the road construction did not begin until two days after that Notice of Approval was published.

Thereafter the parties reached an agreement on the road. District Ranger Johnson sent a letter dated November 4, 1993 to Baker stating that "[t]his letter is notice of approval of your Plan of Operation for the Crazy Lumberjack Mining proposal ... which you submitted on January 9, 1993...." *See,* Exhibit C to Complaint (Docket No. 1). The letter also stated that a reclamation bond for $6,077.00 "must be posted prior to any initiation of activity under this [Plan]." *Id.* The last paragraph of the letter stated as follows: "If you are in agreement with the above items, please indicate with your signature and they will be incorporated into your Plan of Operation." *Id.* The letter then had a signature line for

Baker's signature. Baker signed the letter on November 11, 1993. *Id.* He sent the letter back to the Forest Service where it was received December 13, 1993. *See,* AR at 22.

Meanwhile, the Forest Service was receiving comments from other agencies. On November 22, 1993, the Idaho Department of Fish and Game sent a letter repeating concerns made earlier (in their February 11, 1993 letter discussed above) about the potential harm to salmon, steelhead, and bull trout from sediment released into the river by the mining activity. *See,* AR at 62. The National Marine Fisheries Service also wrote on November 23, 1993, expressing concerns that Baker's mining activity may harm the chinook salmon. *See,* AR at 61. The letter indicated that a NMFS staff member observed on October 15, 1993, that Baker had left large mounds of soil near the Yankee Fork. The staff member feared that erosion would pull much of this soil into the stream, threatening the salmon. The letter concluded that the Forest Service

should initiate and conclude emergency consultation ... on immediate mitigation measures that will be taken in the near term to reduce adverse risks to listed salmon. This emergency consultation must then be followed by a formal consultation to fully satisfy ESA section 7(a)(2).... Pending completion of these consultations, the USFS should make no irreversible or irretrievable commitment of resources with respect to the subject actions.

*Id.* at p. 3.

Baker called District Ranger Johnson on December 6, 1993, and was informed that the approval of the plan had been withdrawn. *See,* Affidavit of Baker at p. 10 (Docket No. 8). District Ranger Johnson confirmed the withdrawal of the approval in a letter dated December 8, 1993. That letter states in pertinent part as follows:

The basis for withdrawing this decision is to follow the consultation process with National Marine Fisheries Service (NMFS) concerning the threatened chinook salmon as outlined in Section 7 of the Endangered Species Act (ESA). We will also have the

opportunity to review and clarify the analysis of the proposal under new regulations pertaining to the National Environmental Policy Act (NEPA).

*See,* Exhibit D to Complaint (Docket No. 1).

Baker appealed this decision to the Forest Supervisor of the Challis National Forest, Charles C. Wildes. Wildes dismissed the appeal, concluding as follows:

> The Yankee Fork Ranger District had not received the executed copy of their November 4, 1993 letter from you, prior to informing you (on December 8, 1993) that the November 4, 1993 letter was no longer applicable. Based on this, I find that the District Ranger voided his letter of November 4, 1993 prior to there being an approved [Plan] in existence. This being the case, there was no approved Plan of Operations in existence to be "withdrawn".... Your Notice of Appeal is hereby dismissed and the record is closed without a decision on the merits....

*See,* AR at 34.

Baker then appealed to the Regional Forester. That appeal was denied without comment except to indicate that the denial was "the final administrative determination of the Department of Agriculture." *See,* AR at 28.

Baker responded by filing a complaint in this Court against the Department of Agriculture and various Department officials. The Complaint seeks three things: (1) A declaratory judgment that the National Environmental Policy Act (NEPA) and the Endangered Species Act (ESA) do not alter the time limits for approval of a mining Plan of Operations set by 36 C.F.R. § 228.5(a); (2) An Order of Mandamus directing the Forest Service to make a timely decision on Baker's Plan; and (3) An Order reversing the decision of District Ranger Johnson withdrawing approval of the Plan.

### III.

### MOTION FOR SUMMARY JUDGMENT

Both parties have filed a Motion for Summary Judgment. Baker's argument can be summarized as follows: (1) The NEPA and the ESA do not apply to approval of a mining Plan of Operations; (2) Even if the NEPA and the ESA apply, they must yield to the specific statutory rights of the miner; and (3) the Forest Service has no power to "withdraw" or "void" a previously approved Plan. The Government takes the converse of each of these arguments. The Court will consider the Motions together, and will address each of the arguments in turn.

### 1. Application of NEPA and ESA to Plan of Operations.

■ The first question posed is whether the requirements of the NEPA and the ESA must be satisfied before the Forest Service may approve a miner's Plan of Operations. The Court will turn first to the applicability of the ESA.

Under the ESA, each federal agency must insure that "any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species...." *See,* 16 U.S.C. § 1536(2). The term "action" is defined in the governing regulations at 50 C.F.R. § 402.02:

> Action means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to:
>
> > (A) actions intended to conserve listed species or their habitat;
> >
> > (B) the promulgation of regulations;
> >
> > (C) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or
> >
> > (D) actions directly or indirectly causing modifications to the land, water, or air.

Thus, under this regulation, the ESA applies whenever a federal agency authorizes the granting of a license. Baker's own briefing asserts that the approval of a Plan of Operations by the Forest Service constitutes a "license." *See,* Brief of Baker in Support of Cross–Motion for Summary Judgment at p. 16. (Docket No. 10). But Baker argues that the granting of such a "license" by the Forest Service does not constitute "action" under the ESA because the Forest Service

must approve any reasonable Plan, reserving only the right to impose mitigation measures.

■ Baker is correct that the Forest Service cannot categorically deny an otherwise reasonable Plan of Operations. *See, United States v. Weiss,* 642 F.2d 296 (9th Cir.1981). But the Forest Service clearly has the power to reject an unreasonable plan, and to impose conditions on the mining activity. *Id.* at 298–99. And no mining activity can proceed until the Forest Service has evaluated the Plan and imposed mitigation measures. *Id.*

Baker's parsing of the term "action" turns on a narrow distinction: There would be "action" if the Forest Service had the power to categorically deny a Plan, but no "action" where the Forest Service only has the power to reject an unreasonable Plan and impose mandatory mitigation measures before any work may begin. Baker cites no authority for such a narrow definition of the term "action" under the ESA. No such distinction is made in the language of the statute or governing regulations. And the case law interpreting the ESA suggests that the legislative intent does not support such a fragile distinction.

The Ninth Circuit has held that "there is little doubt that Congress intended to enact a *broad* definition of agency action in the ESA...." *Pacific Rivers Council v. Thomas,* 30 F.3d 1050 (9th Cir.1994) *cert. denied* — U.S. ——, 115 S.Ct. 1793, 131 L.Ed.2d 721 (1995) (emphasis added). The Supreme Court has also emphasized the all-inclusive nature of the term "action" under the ESA. *See, TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). Under this authority, the term "action" is broad enough to include the Forest Service's approval of a miner's Plan of Operations. *See, Wilkinson & Anderson, Land and Resource Planning in the National Forests,* 64 Ore. L.Rev. 1, 265–66 (1985) ("[M]iners [in the National Forests] must comply with ... protective legislation, such as the Endangered Species Act.").

This District has held that the ESA applies to the Forest Service when it evaluates Land and Resource Management Plans (LRMPs). *Pacific Rivers Council v. Thomas,* 873 F.Supp. 365 (D.Idaho 1995). A LRMP is a long-range plan for the management of National Forest resources. In *Thomas,* the Court held that the ESA required the Forest Service to consult with the NMFS before approving a LRMP for the Challis National Forest, which is where Baker's Claims are located. In so holding, *Thomas* followed the Ninth Circuit case of *Pacific Rivers Council v. Thomas, supra.*

As Baker accurately points out, there is some distinction between the *Thomas* line of cases and this case. Here, the Plan reviewed by the Forest Service was submitted by the operator, whereas in the *Thomas* cases the LRMPs were promulgated by the Forest Service itself. But the *Thomas* cases clearly show the trend both in this District and the Ninth Circuit to interpret the ESA broadly in applying it to the Forest Service.

■ A similar analysis applies to the NEPA issue. In *Havasupai Tribe v. U.S.,* 752 F.Supp. 1471 (D.Ariz.1990), *aff'd,* 943 F.2d 32 (9th Cir.1991), *cert. denied,* 503 U.S. 959, 112 S.Ct. 1559, 118 L.Ed.2d 207 (1992), the Court recognized the same argument that Baker makes here: "The NEPA does not expand the authority of the Forest Service to include rejection of an otherwise reasonable plan of operations." 752 F.Supp. at 1492. But the Court nevertheless went on to apply the requirements of NEPA to the Forest Service's approval of a mining Plan of Operation. And in *Cady v. Morton,* 527 F.2d 786 (9th Cir.1975), the Ninth Circuit applied NEPA to the approval of a mining plan by the United States Geological Survey.

The Court therefore concludes that the NEPA and the ESA apply to the evaluation by the Forest Service of proposed Plans of Operation for mining activity in National Forests. This leads the Court to the more difficult question of how to reconcile these environmental protection statutes with other legislation which accords mining a special status. Baker asserts that the statutes must be reconciled by giving preference to the mining statutes, or, if irreconcilable conflict exists, the environmental statutes must yield to mining laws. The Court will now address this issue.

## 2. Reconciliation of NEPA, ESA, and Mining Statutes.

■ While mining "has been accorded a special place in our laws relating to public lands," *Weiss,* 642 F.2d at 299, there is no doubt that mining activities are subject to regulation to protect the environment. *California Coastal Comm'n v. Granite Rock,* 480 U.S. 572, 107 S.Ct. 1419, 94 L.Ed.2d 577 (1987). There is no inherent conflict between mining and environmental interests; indeed, they "were intended to and can coexist." *Weiss,* 642 F.2d at 299.

■ The Mining Act of 1872, 30 U.S.C. §§ 22–54, is still the basic law governing mining activities today. That Act consolidated existing laws, and promoted prospecting on public lands. About 25 years later, Congress made it clear that mining was allowed in the National Forests, and delegated to the Secretary of Agriculture the authority to prescribe "rules and regulations" that would govern mining activity. 16 U.S.C. § 478.

While the original Mining Act of 1872 contained no environmental protections, Congress later revised the Act to declare that it was the "policy of the Federal Government ... to promote the wise ... use of our natural ... mineral resources ... and to lessen any adverse impact of mineral extraction and processing upon the physical environment...." 30 U.S.C. § 21a. Since then, the Department of Agriculture's Forest Service has promulgated regulations governing mining activity. Specifically, the Forest Service has promulgated regulations requiring that mining in National Forests "be conducted so as to minimize adverse environmental impacts on National Forest System surface resources." 36 C.F.R. § 228.1 (1993).[3]

These regulations require the holder of a Mining Claim to file a proposed Plan of Operations before conducting any "significant disturbance of surface resources." 36 C.F.R. § 228.4(a) (1993). If the Plan meets the threshold requirements of § 228.4(c), the Forest Service shall, within 30 days of receipt of the Plan, either (1) approve it; (2) modify it to comply with the regulations; (3)

notify the operator that another 60 days is needed to examine the Plan; or (4) notify the operator that the Plan cannot be approved until a final environmental statement has been prepared and filed with the Council on Environmental Quality. 36 U.S.C. § 228.5 (1993). The regulations further provide that mining operations shall comply with all Federal and State air and water quality standards and solid waste disposal standards. 36 U.S.C. § 228.8 (1993). In addition, the operator "shall take all practicable measures to maintain and protect fisheries and wildlife habitat which may be affected by the operations." *Id.*

In addition, as the Court discussed above, the Plan is subject to the ESA and the NEPA. Under the ESA, the Forest Service is required to consult with the appropriate federal fish and wildlife agency whenever the mining activity "may affect" an endangered or threatened species. *See,* 50 C.F.R. § 402.14(a). Under NEPA, the Forest Service prepares an Environmental Assessment (EA) to determine whether a full-blown Environmental Impact Statement (EIS) is required.

The variety and complexity of regulations governing miners in National Forests is certainly bewildering. In typical understatement, Supreme Court Justice Lewis Powell described the legislation as an "almost impenetrable maze...." *Granite Rock,* 480 U.S. at 606, 107 S.Ct. at 1438. Amidst this confusion, it comes as no surprise that some regulations may overlap or conflict.

One of the most conspicuous conflicts occurs between 36 C.F.R. § 228.5 and the requirements of the NEPA and the ESA. The regulation at § 228.5 requires the Forest Service to act on the proposed Plan of Operation within a maximum of 90 days. But the preparation of an EA required by the NEPA will generally take months given the many subjects that must be covered. Although the EA is less extensive than a full EIS, the Supreme Court has stated that an EIS for a very simple project, prepared by experienced personnel, may take "three to five months to complete," with complex EISs prepared by

**3.** Throughout this Memorandum Decision, the Court will cite the Forest Service regulations in

effect at the time the challenged decisions were made: 1993.

inexperienced personnel taking "up to 18 months to prepare." *Flint Ridge Dev. Co. v. Scenic Rivers Assoc.*, 426 U.S. 776, 788 at n. 9, 96 S.Ct. 2430, 2438 n. 9, 49 L.Ed.2d 205 (1976). In this case the Forest Service EA was not prepared until 10 months after the Plan was filed. And if the Plan proposes activity in the habitat of an endangered or threatened species, the Forest Service must prepare a Biological Assessment, which in this case took almost 9 months. If the BA concludes that the Plan may affect an endangered or threatened species, the Forest Service must then consult with the appropriate federal agency—in this case, the NMFS. That consultation adds additional time.

The Forest Service wrote the 90–day time limit regulation contained in § 228.5 in 1974. *See, Source Note for § 228* at 36 C.F.R., p. 148 (1993). Although the ESA was passed in 1973, the implementing regulations concerning the BA and the consultations were not published until 1986. *See, Source Note for § 402* at 50 C.F.R., p. 485 (1993). Although the NEPA was passed in 1970, the implementing regulations concerning the EA requirements were not published until 1978. *See, Source Note for § 1501* at 40 C.F.R., p. 632 (1993).

This discussion shows the dramatic change in the law since the Forest Service imposed the 90 day limit on itself in 1974. Both sides in this case recognize that there is an irreconcilable conflict between that 90 day limit and the regulatory requirements of the NEPA and the ESA, especially given the presence here of an endangered species. It is a well-established rule of statutory interpretation that the more recent of two irreconcilably conflicting statutes governs. *See, Watt v. Alaska*, 451 U.S. 259, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981); 2A C. Sands, *Sutherland on Statutes and Statutory Construction*, § 51.02 (5th ed. 1992). Here, the environmental regulations are the most recent pronouncement, and thus the 90 day limit must give way in the event of a conflict.

This conclusion does not mean that the Forest Service is unencumbered by time limits in examining Operating Plans. As will be discussed later in this decision, there are specific time limits governing the Forest Service's consultations with other agencies, as well as its preparation of the various environmental studies such as the EA and the BA. In addition, the Forest Service is bound by a general rule prohibiting unreasonable delays. Thus, the approval of an Operating Plan remains subject to time constraints even if the 90 day limit is inapplicable.

Baker counters that the 90 day limit must prevail under the holding of the Supreme Court in *Flint Ridge Dev. Co. v. Scenic Rivers Assoc., supra.* The Plaintiffs in *Flint Ridge* argued that the Department of Housing and Urban Development (HUD) was required to prepare an EIS under NEPA on any subdivision whose filing it had approved. By statute, 15 U.S.C. § 1706, HUD had 30 days to act. The Supreme Court held that an EIS could never be prepared within 30 days, and that to apply the NEPA to HUD under these circumstances would be to repeal the statute setting the 30 day limit. The Court held that "where a clear and unavoidable conflict in *statutory* authority exists, NEPA must give way." *Id.* at 788, 96 S.Ct. at 2438 (emphasis added). The Court reasoned that NEPA "was not intended to repeal by implication any other *statute.*" *Id.* (emphasis added).

*Flint Ridge* is distinguishable because the 90 day limit imposed by 36 C.F.R. § 228.5 is a creature of regulation, not statute. Counsel has not pointed the Court to any statute setting time limits for the Forest Service to act on a Plan of Operations. The Ninth Circuit has held that "*[o]nly* if there is an 'irreconcilable' conflict between *the statute* and NEPA will the requirements of NEPA not apply." *Westlands Water Dist. v. Nat. Res. Def. Council,* 43 F.3d 457 (9th Cir.1994) (emphasis added). When the application of the NEPA would not "repeal by implication any other statute," *Flint Ridge* does not require that the NEPA be ignored. *Flint Ridge,* 426 U.S. at 788, 96 S.Ct. at 2438.

Here, there is no statutory authority for the 90 day limit, and thus the application of the NEPA would not set aside any mandate of Congress. In fact, the congressional mandate is that the NEPA apply. As the Ninth Circuit has recognized, there is an "important *congressional* mandate to have NEPA

apply to the fullest extent possible." *Jones v. Gordon,* 792 F.2d 821, 826 (9th Cir.1986) (emphasis added). *Jones* goes on to hold that it is "the *congressional* desire that we make as liberal an interpretation as we can to accommodate the application of NEPA." *Id.* (emphasis added). This mandate of Congress does not step aside for an agency regulation now badly outdated.

Given these important policy considerations, and given the time constraints that remain on the Forest Service to govern its approval process, the Court finds that the 90 day limit set out in 36 C.F.R. § 228.5 is inapplicable to this case.

### 3. Unreasonable Interference with Right to Mine.

■ In *United States v. Weiss, supra,* the Ninth Circuit struck a careful balance between mining and the need for environmental protection:

> "While prospecting, locating, and developing of mineral resources in the national forests may not be prohibited nor so unreasonably circumscribed as to amount to a prohibition, the Secretary [of Agriculture] may adopt reasonable rules and regulations which do not impermissibly encroach upon the right to the use and enjoyment of placer claims for mining purposes." *Id.* at 299.

Baker asserts that his right to operate his Mining Claim has been "unreasonably circumscribed" because he has been barred from mining his Claims since he filed his Plan over 3 years ago. While the 90 day limitation of 36 C.F.R. § 228.5 is inapplicable to this case because of the many environmental requirements that must be satisfied, many of those environmental requirements have time limitations. Thus, the BA must be completed within 180 days after its initiation. *See,* 50 C.F.R. § 402.12(I) (1993). A formal consultation under the ESA must be completed within 90 days after its initiation unless extended as provided in the regulations. *See,* 50 C.F.R. § 412.14(e) (1993). Overarching these specific time limits is the *Weiss* requirement that the Forest Service not cause delays that would "impermissibly encroach upon the right to the use and enjoy-

ment of placer claims for mining purposes." *Weiss,* 642 F.2d at 299.

Although Baker has set out in some detail the *facts* concerning the delays, there was not a corresponding detailed discussion by either party of the *law* in their briefing. The Court's own research has found the regulatory time limits discussed above, and there are undoubtedly many others. Neither party has pointed the Court to the applicable regulations governing time limitations. Neither party has discussed the *Weiss* standard in any detail. The briefing and oral arguments leave many unanswered questions. Are there analogous cases where Courts have set "reasonable" time limits? What factors do the Courts examine in setting such a "reasonable" limitation? Did the application of state environmental protection statutes, which also govern the Plan, *see, Granite Rock,* 480 U.S. at 606, 107 S.Ct. at 1438, cause delays here?

The APA specifically allows this Court to "compel agency action . . . unreasonably delayed. . . ." 5 U.S.C. § 706(1). The Ninth Circuit has held that this provision of the APA gives this Court the authority to "compel an agency to act within a reasonable time." *Houseton v. Nimmo,* 670 F.2d 1375, 1377 (9th Cir.1982). There is a body of law on this issue that was unaddressed in the briefing.

This case is further complicated by an injunction issued in another case halting all mining in the Challis National Forest where Baker's Claims are located. In *Pacific Rivers Council v. Thomas,* 873 F.Supp. 365 (D.Idaho 1995), the Court enjoined the Forest Service from approving any mining activity—and enjoined all "ongoing" activity—until the Forest Service completed its formal consultation with the NMFS concerning the impacts of the LRMPs. That injunction was issued on January 12, 1995, *Id.* at 365, and was dissolved on March 8, 1995. *See,* Order (Docket No. 189) in *Pacific Rivers Council v. Thomas,* 897 F.Supp. 454 (D.Idaho 1995).

This District of Idaho case was preceded by a Ninth Circuit case with the same name, but involving National Forests in Oregon. In *Pacific Rivers Council v. Thomas, supra,*

the Circuit upheld an injunction against the Forest Service for its failure to consult with the NMFS. The injunction prohibited the Forest Service from granting approval for any use that constituted an "irreversible or irretrievable commitment of a resource...." *Id.* at 1053. That injunction was originally granted by the District Court on October 25, 1993, four days after the Forest Service published its Notice of Approval of Baker's Plan in the Challis Messenger. *See, Pacific Rivers Council v. Robertson,* 854 F.Supp. 713 (D.Ore.1993). Less than a month after the Oregon District Court's injunction in *Pacific Rivers,* the NMFS was writing a vigorous letter to the Forest Service suggesting consultation, and the Forest Service was very readily adopting the suggestion and "withdrawing" its approval of the Plan so that it could consult with the NMFS concerning the salmon.

The status of the salmon had not changed between the date of approval of the Plan (October 21, 1993 by publication and November 4, 1993, by letter) and the "withdrawal" of that approval (December 8, 1993). The spring/summer and fall chinook salmon were listed as "threatened" species under the ESA in 1992, and that listing did not change to "endangered" until August 1994. *See,* 59 Fed.Reg. 42529 (1994). As is clear from the earlier discussion of the background of this litigation, the potential harm to the salmon, and the possible need to consult with the NMFS, was well-known prior to the approval. The BA and the EA specifically studied the dangers posed by the Plan to the salmon, and extensive mitigation measures were imposed on Baker.

Thus, the delays caused by the "withdrawal" of the approval of the Plan on December 8, 1993, were not occasioned by a change in the status of the salmon, but rather by the Forest Service's recognition of a perceived legal duty to consult with the NMFS. Did the Forest Service in fact have a legal duty to consult with the NMFS? If so, should the Forest Service have fulfilled that legal duty much sooner given its knowledge early on that the Plan affected a "threatened" species? Or was the legal duty of the Forest Service unclear until the *Thomas* line of

cases came out, ordering the Forest Service to consult with the NMFS?

This discussion show the numerous questions that exist concerning the delay issue. Neither side answered these questions to the extent necessary to be entitled to a decision *as a matter of law.* The Court shall therefore deny the Summary Judgment Motions on this issue, without prejudice to the rights of the parties to file Motions that address this issue in detail.

### 4. Improper Withdrawal of Approval of Plan of Operations.

Baker is seeking a summary judgment reversing the decision of the Forest Service to "withdraw" its prior approval of Baker's Plan. The Government has not argued that Baker has failed to exhaust his administrative remedies, or that the decision of the Forest Service is unreviewable. The Court will therefore consider those issues settled, and will proceed to review the Forest Service decision.

In reviewing agency action, this Court is guided by the review provisions contained in the Administrative Procedure Act, specifically 5 U.S.C. § 706(2)(A). That provision provides that the reviewing Court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law...." The Supreme Court has held that the ultimate standard of review under this provision is narrow, and that the Court is not entitled to substitute its judgment for that of the agency. *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Ins. Co.,* 463 U.S. 29, 31, 103 S.Ct. 2856, 2860–61, 77 L.Ed.2d 443 (1983). This does not infer, however, that the standard of review is one of capitulation; this Court must conduct a "searching and careful" review. *Mt. Graham Red Squirrel v. Espy,* 986 F.2d 1568, 1571 (9th Cir.1993).

In order for an agency decision to be upheld under the arbitrary and capricious standard, a court must find that "evidence before the agency provided a rational and ample basis for its decision." *Northwest Mo-*

*torcycle Ass'n v. USDA,* 18 F.3d 1468, 1471 (9th Cir.1994). An agency's interpretation of its own regulations controls "unless it is plainly erroneous or inconsistent with the regulations." *Nevada Land Action Ass'n v. U.S. Forest Service,* 8 F.3d 713 (9th Cir. 1993). With these standards in mind, the Court will determine whether the decision of the Forest Service to withdraw its prior approval of Baker's Plan was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

The Forest Service has two separate justifications for its decision to withdraw its approval of Baker's Plan. First, the decision of District Ranger Johnson provided that the approval was "withdrawn" for two reasons: (1) the Forest Service needed to consult with the NMFS concerning the "threatened chinook salmon as outlined in Section 7 of the Endangered Species Act (ESA)," *see,* Exhibit D to Baker's Complaint (Docket No. 1); and (2) the Forest Service needed the "opportunity to review and clarify the analysis of the [Plan] under new regulations pertaining to the [NEPA]." *Id.*

On appeal, the Forest Supervisor, Charles C. Wildes, abandoned District Ranger Johnson's justifications, and pursued a new line of reasoning. Wildes found that District Ranger Johnson incorrectly concluded that he had "withdrawn" his approval of Baker's Plan. Wildes ruled that in fact there was no final approval for Johnson to "withdraw." To reach this result, Wildes interpreted Johnson's November 4, 1993 letter to mean that Johnson's approval of the Plan of Operations was contingent on Baker returning an executed copy of the letter, and filing the bond required by the letter. *See,* AR at 34. Wildes reasoned that since Baker had not complied with either of these two conditions, District Ranger Johnson was free to "void" his November 4, 1993 letter. Wildes concluded that "there was no approved Plan of Operations in existence to be 'withdrawn.'" *See,* AR at 34.

█ The Court will examine first the decision of Forest Supervisor Wildes. The validity of his decision hinges on his conclusion that the November 4, 1993 letter made approval of the Plan contingent on the receipt of a bond and the executed letter. The letter certainly requires a bond, but nowhere states that approval is contingent on the bond being filed. Rather the letter provides that the bond is a condition not to *approval of the Plan,* but instead to *the initiation of mining activity.* The letter states that the bond "must be posted *prior to any initiation of activity under this [Plan]."* *See,* Exhibit C to Baker's Complaint (Docket No. 1) (emphasis added). There is nothing in the letter conditioning approval on the filing of the bond.

The same analysis applies with regard to Baker's signature of approval. The last paragraph of the approval letter of November 4, 1993, states that "[i]f you are in agreement with the above items, please indicate with your signature and they will be incorporated into your Plan of Operation." *Id.* There is no indication anywhere in the letter that the approval of the Plan is conditioned on Baker's signature, or that the approval given could be "voided" at any time prior to Baker returning the executed letter.

█ Thus, Forest Supervisor Wildes' decision has no basis in fact. It likewise has no basis in law. The Government has not pointed the Court to any regulation or statute that makes the approval of an Operating Plan conditional on the bond and an executed copy of the approval letter, or that permits the Government to void a letter which, on its face, constitutes an approval of an Operating Plan. In fact, it appears that 36 C.F.R. § 228.4(e) contains a well-defined procedure for modifying an approved Plan of Operation, and that those procedures were not followed by the Forest Service in this case. Section 228.4(e) provides that if, after a Plan is approved, the Forest Service discovers "unforseen significant disturbance of surface resources," the Forest Service "may ask the operator to furnish a proposed modification of the Plan." If the operator refuses, the Forest Service may require the operator to furnish a modified Plan, but only if the Forest Service first considers: "(1) Whether all reasonable measures were taken by the [Forest Service] to predict the environmental impacts of the proposed operations prior to approving the operating plan; (2) Whether

the disturbance is or probably will become of such significance as to require modification of the operating plan in order to meet the requirements for environmental protection specified in § 228.8; and (3) Whether the disturbance can be minimized using reasonable means."

Even when these 3 findings have been made, the operator may continue his mining activity "unless the [Forest Service] determines that the operations are unnecessarily or unreasonably causing irreparable injury, loss or damage to surface resources and advises the operator of those measures needed to avoid such damage." *See,* 36 C.F.R. § 228.4(e)(3) (1993).

■ Forest Supervisor Wildes made none of these findings. District Ranger Johnson likewise ignored this regulation. It is a well-established rule that an agency is bound to follow the regulations it issues. *See, United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); 1 Davis & Pierce, *Administrative Law Treatise,* § 6.5 at p. 251 (3rd Ed.1994) ("The idea that legislative rules are binding on the issuing agency is deeply embedded."). Those under the agency's jurisdiction have a right to insist that the agency adhere to its own rules. *See, City of Santa Clara v. Andrus,* 572 F.2d 660 at n. 5 (9th Cir.), *cert. denied,* 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978). The Forest Service regulations provide a clear 4–step procedure for modifying or halting work on mining claims after the Plan of Operations has been approved. There is no provision in those regulations allowing the Forest Service to simply withdraw its approval of a Plan. At most, the Forest Service could halt mining, and modify the Plan to require additional mitigation measures, after making the findings required by 36 C.F.R. § 228.4(e).[4] Perhaps the legal requirements of the NEPA and the ESA provide sufficient grounds for modifying and halting mining activity under 36 C.F.R. § 228.4(e).[5] Even so, the Forest Service is required to follow the procedures of § 228.4(e), and to make the findings re-

quired by that regulation, before the Plan may be modified and the mining stopped.

Thus, the Forest Service decision has no basis in the law, and, as previously discussed, has no basis in fact. The decisions of the District Ranger and the Forest Supervisor are not in accordance with law, constitute an abuse of discretion, and are arbitrary and capricious under 5 U.S.C. § 706(2)(A).

The Government nevertheless asserts that Judge Harold L. Ryan, since deceased, ruled earlier in this case that the Forest Service had properly withdrawn approval. Judge Ryan did consider Baker's Motion for Stay which had been filed just 3 months after Baker filed his complaint. Judge Ryan denied that stay. In so ruling, Judge Ryan did not rule directly on the merits of Baker's claims, but instead examined whether Baker "is *likely* to prevail on the merits." *See,* Order at p. 3 (Docket No. 23) (emphasis added). Thus, Judge Ryan did not make a final determination that the Forest Service properly withdrew its approval of Baker's Plan. Instead, Judge Ryan merely held— early in the litigation—that the Forest Service appeared "likely" to prevail on that issue. It is well-established that such a ruling is not final in any sense and thus has no preclusive effect. *See, Pasadena City Bd. Of Education v. Spangler,* 427 U.S. 424, 437, 96 S.Ct. 2697, 2705, 49 L.Ed.2d 599 (1976).

Baker has shown, as a matter of law, that the Forest Service decisions must be set aside under the standard of review set forth in 5 U.S.C. § 706(2)(A). The Court will grant that portion of Baker's Motion for Summary Judgment requesting a reversal of the decisions of the Forest Service withdrawing its approval of Baker's Plan.

## IV.

### CONCLUSION

This Court has been commanded by *Weiss* to seek a balance between mining and environmental interests. In striking that bal-

---

**4.** Another regulation gives the Forest Service the right to inspect the mining activity, and to require the operator to cure any failure to comply with the Plan. *See,* 36 C.F.R. § 228.7 (1993).

That regulation says nothing about authorizing a withdrawal of approval for a Plan.

**5.** The Court expresses no opinion on this issue.

ance, the Court finds first that the Forest Service properly considered the requirements of the NEPA and the ESA in examining Baker's Operating Plan, and that the 90 day limit set by 36 C.F.R. § 228.5 is inapplicable. But on the other side of the scales, the Forest Service must abide by its own regulations and cannot effectively halt mining by violating regulatory time limits and creating unreasonable delays.

The remaining challenge in this case is to determine whether the Forest Service has improperly delayed this matter. The briefing was not sufficient on this issue to enable the Court to rule as a matter of law. Counsel need to meet together to see if they can agree on whether this issue could be submitted to the Court by way of summary judgment, or whether .a trial is necessary. In addition, the Court needs guidance from counsel on the effect of the Court's reversal of the Forest Service decision withdrawing its approval of Baker's Operating Plan. The Court will therefore set a deadline for counsel to meet together to reach agreement on a plan for the progress of this litigation, and will then set up a status conference to discuss that plan.

## V.

### ORDER

In accordance with the views expressed in the Memorandum Decision above,

NOW THEREFORE IT IS HEREBY ORDERED, that the Government's Motion for Summary Judgment (Docket No. 26) be, and the same is hereby, GRANTED IN PART AND DENIED IN PART, and that the Plaintiff's Cross–Motion for Summary Judgment (Docket No. 51) be, and the same is hereby, GRANTED IN PART AND DENIED IN PART.

IT IS FURTHER ORDERED, that the Government's Motion is Granted in part and the Plaintiff's Motion is Denied in part, the Court finding as a matter of law: (1) that the NEPA and the ESA apply to the Forest Service approval process concerning mining Plans of Operation; and (2) that the NEPA and the ESA are not rendered inapplicable because they lengthen the approval process

beyond the 90 limit set out in 36 C.F.R. § 228.5.

IT IS FURTHER ORDERED, that the Government's Motion is Denied in part, and the Plaintiff's Motion is Granted in part, the Court finding as a matter of law that the Forest Service decision withdrawing its approval of Plaintiff's Plan of Operations must be set aside pursuant to 5 U.S.C. § 706(2)(A).

IT IS FURTHER ORDERED, that the Government's Motion is Denied in part, and the Plaintiff's Motion is Denied in part, the Court finding that neither party is entitled to Summary Judgment at this time on the issue whether Plaintiff's right to mine his Crazy Lumberjack Claims has been unreasonably circumscribed by Forest Service delays.

IT IS FURTHER ORDERED, that the parties shall meet together within thirty (30) days from the date of this Order to work out a complete or partial agreement concerning how this litigation should proceed. After that meeting, counsel shall contact the Court's Clerk, Ms. LaDonna Garcia, at 208–334–9021, to schedule a Status Conference with the Court to develop a plan for this litigation.